# In the Iowa Supreme Court

No. 22–1801

Submitted November 14, 2024—Filed January 31, 2025

In the matter of the **Estate of John Eugene Johnston,** deceased.

**Peggy Johnston,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Wapello County, Greg Milani, judge.

The estate seeks further review of a court of appeals decision reversing the dismissal of a claim on the estate. **Decision of Court of Appeals Affirmed; District Court Judgment Reversed and Case Remanded.**

Christensen, C.J., delivered the opinion of the court, in which all justices joined except Mansfield, J., who filed a dissenting opinion.

Bryan J. Goldsmith and Richard J. Gaumer of Gaumer, Emanuel & Goldsmith, P.C., Ottumwa, for appellant.

Randall C. Stravers of Stravers Law Firm, Oskaloosa, and Greg Life, Oskaloosa, for appellee.

**Christensen, Chief Justice.**

After a man's will was admitted to probate, his wife made a claim on the estate for half of the money that her husband removed from their joint bank account before his death. The wife claimed the couple owned the bank account as joint tenants, and her husband removed funds in excess of his interest from the account. The district court dismissed the wife's claim, concluding that the wife was making a claim for conversion sounding in tort and had not met the legal standard.

On appeal, the wife rejected the district court's use of this legal standard and argued that a legal standard from our caselaw on joint tenancies applied. We transferred the case to the court of appeals, which agreed with the wife and reversed the decision and remanded back to the district court. The estate sought further review, which we granted. Upon further review, we affirm the decision of the court of appeals. For the reasons explained below, we hold that the district court applied an incorrect legal standard and remand for a new trial.

**I. Background Facts and Proceedings.**

John and Peggy Johnston married in 1980 and were together for approximately forty-three years before John's death. Throughout their marriage, John and Peggy jointly owned two bank accounts at First Iowa State Bank with rights of survivorship. One account was a money market account where the couple deposited money to accumulate interest, and the other account was a checking account they used to pay bills. Peggy agreed the couple did not "make an attempt to distinguish in the accounts what was [hers] and what was his." She also stated that John became more secretive about the accounts later in their marriage and made withdrawals without her knowledge, although she accessed the accounts online and sometimes had access to paper bank

statements. When John passed away, there was $84.39 left in the checking account and $637.76 left in the money market account.

John died testate on March 11, 2018, and his will was admitted to probate on March 16. John created his will in 2017 without discussing it with Peggy. The will did not include Peggy at all. Instead, the will divided his assets amongst his three daughters from a prior marriage. The estate's report and inventory also noted that Rebecca Askeland, one of John's daughters from a prior marriage and a coexecutor of the estate, had the right of survivorship to a joint checking account that she owned with John worth $79,761.12 at the time of John's death.

In response, on March 27, Peggy filed a notice of her election as the surviving spouse to receive her share of John's estate. On August 16, she made a claim on the estate for $94,500, asserting that she was entitled to half of the funds that John transferred out of the couple's joint account. Particularly, she claimed half of a $70,000 certificate of deposit (CD), a $40,000 CD, and the approximately $80,000 joint checking account owned by John and Rebecca. The estate and Rebecca denied that Peggy had any interest in the funds.

In her prehearing brief, Peggy dropped the claim against the joint checking account but still claimed she was entitled to half of the following assets: the $40,000 CD, the $70,000 CD, and "the boot used to buy [John's] new truck," for a total of $63,341.25 plus interest. On appeal, Peggy dropped her claim concerning the new truck and is only claiming she has an interest in half of each CD.

The two CDs in question were purchased by John before his death with funds that Peggy contends came from, or passed through, their joint money market account. The $70,000 CD was issued on September 6, 2016, with John and Rebecca listed as joint owners. One day later, John withdrew exactly

$70,000 from the couple's joint money market account to fund the CD. The record indicates that both parties agree this money came from the sale of a property that only John had purchased and owned.

However, there is conflicting evidence in the record about John's property and where the $70,000 came from. The property was purchased during the couple's marriage in 1994 with a sheriff's deed signed only by John. When the property was conveyed to its new owner by warranty deed on April 29, 2011, both John and Peggy were listed as the sellers.[1] Additionally, the CD was not issued until 2016, so for the CD to have been funded by the property sale, the money must have sat in the couple's account uncommingled with other funds for around five years. When John withdrew the $70,000 out of the joint account, there was approximately $77,000 in it. But during those five years, the funds in the account dropped below $70,000, such as in 2015 when the account had less than $20,000 in it.

Regardless of where the money originated from, after the CD matured on March 6, 2017, John claimed the $70,052.07 and placed it into his separate checking account on March 9. Based on the account number, this was the checking account John eventually owned with Rebecca, and that she had the right of survivorship to when he passed.

The $40,000 CD was issued on June 26, 2015, with John and Rebecca again listed as joint owners. The $40,000 used to create this CD passed through the couple's joint money market account on the same day. John deposited

---

[1] "If a married person, either husband or wife, is the seller, it is essential that the other spouse be made a party to and sign the contract in order to release his or her spouse's and homestead interest and to require such spouse to join in the execution of the deed or contract for a deed to be given on the closing of the sale." 1 Marlin M. Volz, Jr., *Iowa Practice Series Methods of Practice* § 6:3, at 126 (2024 ed. 2024).

$45,736.05 into the account and simultaneously removed $40,000, leaving only $5,736.05 in the joint money market account.[2]

It is unclear where John accessed the $40,000 used to create the CD. The estate notes that the $45,736.05 came from a different CD owned solely by John but does not state from where the funds for that CD originated. Peggy claims the money in the original CD came from the sale of one of the couple's homes to their grandson; however, Peggy testified that the money from the sale of that house went into their joint checking account and then was used to buy the home they were living in when John passed. Again, regardless of where the money originated, once the CD matured, the $40,331.82 ended up in John's separate checking account that he later owned with Rebecca.

On October 5, 2022, the district court held a hearing on Peggy's claim. After Peggy's testimony, the estate made a motion for a directed verdict.[3] During the hearing on the motion, the estate argued, "[T]he testimony is clear there was no attempt by the parties to keep track of the monies in those accounts as my account, your account." Furthermore, the estate argued that the funds for both CDs came from property that belonged solely to John and only passed through the bank account. In response to the motion, Peggy argued that money put into a joint account may be considered a gift to the other joint owner. According to Peggy, there was no alternative agreement in place, so each joint owner had an

---

[2]A deposit slip shows that the $45,736.05 was deposited into the account, and on the same slip, $40,000 was withdrawn for a new CD. The parties seem to agree that the money passed through the account.

[3]Because this matter was tried without a jury, the motion for a directed verdict should have been characterized as a motion to dismiss. "The misnomer is not material, however, because a motion to dismiss during trial is equivalent to a motion for directed verdict." *Iowa Coal Mining, Co. v. Monroe County*, 555 N.W.2d 418, 438 (Iowa 1996) (citing *B & B Asphalt Co. v. T. S. McShane Co.*, 242 N.W.2d 279, 281 (Iowa 1976)). In its ruling, the district court characterized the motion as a motion to dismiss.

equal interest in the funds John deposited into the account, and John "diverted and converted" more funds from the account than he was entitled to. Thus, Peggy argued that the estate is liable to her for the excess withdrawn.

The district court made a ruling on the record:

> The Court has considered the evidence in the light most favorable to the plaintiff and grants the motion to dismiss. The Court finds that for conversion there has to be ownership by the plaintiff or other possessory right in the plaintiff greater than that of the defendant. There was no evidence of that in this case.
>
> [The plaintiff] [a]lso has to show dominion or control over titles by the defendant inconsistent with or derogation of the plaintiff's possessory rights. There's limited evidence of that and limited evidence of damages. There's no evidence to prove this was anything other than estate planning done by the decedent. And there's also great evidence that th[e] account transfers were made and done with the knowledge of the plaintiff and with her consent.
>
> When you consider the sources of the funds, particularly all the income apparently to the account came from income, retirement income, and earnings of the decedent. And therefore, the Court rules case dismissed.

Subsequently, the district court entered an order dismissing Peggy's claim for the reasons stated in the record.

We transferred Peggy's timely appeal to the court of appeals, where she argued that the district court applied the wrong legal standard. The court of appeals agreed and remanded the case back to the district court. The estate sought further review, which we granted.

**II. Standard of Review.**

We review rulings granting a defendant's motion to dismiss during a nonjury trial for correction of errors at law. *Wernimont v. State*, 312 N.W.2d 568, 570 (Iowa 1981). We view the evidence in the light most favorable to the plaintiff. *Id.*

**III. Analysis.**

**A. Legal Standard.** When making its decision, the district court stated, "[F]or conversion there has to be ownership by the plaintiff or other possessory right in the plaintiff greater than that of the defendant. . . . [The plaintiff] [a]lso has to show dominion or control over titles by the defendant inconsistent with or derogation of the plaintiff's possessory rights." Based on this articulated standard, the district court determined there was no evidence of the first element and only limited evidence of the second element. The district court also determined there was only limited evidence of damages.

Peggy argues that the district court improperly applied the legal standard for a conversion claim sounding in tort to her claim to recoup funds removed by a joint tenant in excess of the joint tenant's interest in a jointly owned bank account. We agree.

The legal standard for a conversion claim sounding in tort would have applied if Peggy had claimed that John removed money from an account that he did not have any interest in. However, neither party has claimed that John did not have an interest in the account. The question presented to the district court was whether John infringed on Peggy's interest in the joint account. Peggy referred to the actions John took as a "conversion" in her prehearing brief and in front of the district court, but her claim was not for a conversion sounding in tort.

The district court should have applied the legal standard that we established in *Anderson v. Iowa Department of Human Services*, 368 N.W.2d 104 (Iowa 1985). There, we stated:

> The right of a joint tenant is generally described as "an undivided interest in the entire estate to which is attached the right of survivorship". *Brown v. Vonnahme*, 343 N.W.2d 445, 451 (Iowa 1984). The precise extent or share of the undivided interest

> attributable to an individual joint tenant may be determined, however. The rights of the individual joint tenants must be determined from their agreement. *Keokuk Savings Bank & Trust Co. v. Desvaux*, 259 Iowa 387, 393, 143 N.W.2d 296, 300 (1966). Generally, the respective rights of the parties to a joint bank account are determined by the rules of contract law, and the intent of the parties with respect to the joint savings account is controlling. 48A C.J.S. *Joint Tenancy* § 23 (1981); *see Jennings v. McKeen*, 245 Iowa 1206, 1214, 65 N.W.2d 207, 211 (1954).

*Id.* at 109. We further explained that each joint tenant with a right of survivorship is presumptively entitled to half of the joint account, but that presumption is rebuttable. *Id.* (citing *Rosenfeld v. Sec'y of Health & Hum. Servs.*, 563 F. Supp. 1192, 1196 (E.D.N.Y. 1983); *First Wis. Tr. Co. v. United States*, 553 F. Supp. 26, 30 (E.D. Wis. 1982); 48A C.J.S. *Joint Tenancy* § 23 (1981)). When determining whether this presumption has been rebutted, a district court may consider the joint tenants' course of conduct throughout the life of the account. *See* 48A C.J.S. *Joint Tenancy* § 29, at 264–66 (2014).

Additionally, in *Anderson*, we adopted caselaw from other states to address the situation where a party withdraws funds in excess of that party's presumptive half from an account owned in joint tenancy. *See* 368 N.W.2d at 110. We stated:

> Generally, a party to a joint bank account may only withdraw funds without liability to his codepositor when in fact he is the real owner of the money. 48A C.J.S. *Joint Tenancy* § 23 (1981). The right to withdraw funds from the joint account depends on the agreement or the understanding of the party. *Id.*

*Id.* at 109–10. Thus, a cotenant may not withdraw from a joint account in excess of the cotenant's proportional interests, and doing so renders the cotenant liable to the other joint tenant for the excess withdrawn. *See Coughlin v. Comm'r of Soc. Servs.*, 428 N.Y.S.2d 291, 293 (App. Div. 1980). "[W]here a joint tenant makes a valid withdrawal, of more than his proportional share, the remedy is not to

invalidate the entire transaction" but "a suit between the joint tenants to recover the funds taken in excess of the withdrawing joint tenant's proportional share." *Kettler v. Sec. Nat'l Bank of Sioux City*, 805 N.W.2d 817, 823 (Iowa Ct. App. 2011); *see also* 48A C.J.S. *Joint Tenancy* § 30, at 266–68 (2014) (identifying the same rule and noting that "[s]uch an action survives the death of the contributing party").

**B. Peggy's Burden.** "[W]e remand for new findings and application of the correct standard" if the district court applied an incorrect legal standard. *Papillon v. Jones*, 892 N.W.2d 763, 773 (Iowa 2017) (quoting *State v. Robinson*, 506 N.W.2d 769, 771 (Iowa 1993)). "Although an omitted ruling on an issue of law may sometimes be cured by this court's ruling on that issue, . . . this is not possible with respect to an omitted finding of fact in a law-tried case." *Id.* (omission in original) (quoting *Power Equip., Inc. v. Tschiggfrie*, 460 N.W.2d 861, 864 (Iowa 1990)). "Such omission requires a remand to the district court so that the fact-finding may first be made in that forum." *Power Equip., Inc.*, 460 N.W.2d at 864. That is the case here because the district court prematurely granted the defendant's motion to dismiss.

When considering a motion to dismiss, a "trial court must view the evidence in the light most favorable to the plaintiff, make every favorable inference for the plaintiff which may be reasonably drawn from [the plaintiff's] evidence, and if, thereby, there is substantial evidence in support of each element of the plaintiff's claim, overrule the motion." *Wernimont*, 312 N.W.2d at 570. Peggy met this burden with the evidence she presented to the district court. *See id.* When considering the evidence in the light most favorable to Peggy, she adequately presented evidence that a joint tenancy existed, she had an interest in the account, and John removed funds from the joint account. The case should

have moved past the motion to dismiss phase to allow for more factfinding regarding whether John removed funds from the account in excess of either party's interest in the account.

We remind the district court to exercise caution in granting motions to dismiss at the close of the plaintiff's evidence during a bench trial. We reiterate that "except in an unusually clear case [the] trial court ordinarily should . . . deny a defendant's [motion to dismiss], let the defendant put on [the defendant's] evidence[,] and then . . . enter findings of fact, conclusions of law and final judgment at the close of all the evidence." *Id.* at 571; *see also State v. Keding*, 553 N.W.2d 305, 308 (Iowa 1996) (approving the Uhlenhopp rule, "which encourages the district court to deny a motion for directed verdict" and "submit the case to the jury to avoid another trial in case of error").

**IV. Conclusion.**

For the foregoing reasons, we affirm the decision of the court of appeals, reverse the judgment of the district court, and remand for a new trial.

**Decision of Court of Appeals Affirmed; District Court Judgment Reversed and Case Remanded.**

All justices concur except Mansfield, J., who files a dissenting opinion.

**Mansfield, Justice (dissenting).**

I respectfully dissent. I generally agree with the law cited by the majority. But I am puzzled by the need for a remand in this case, and I suspect the district court will be puzzled as well.

This case presents a fairly common fact pattern. A married couple maintained one or more joint bank accounts. The joint accounts were used to pay the couple's regular living expenses. Spouse #1 regularly deposited all of Spouse #1's income into the joint accounts. Spouse #1 also deposited funds from the sale of Spouse #1's own assets into the joint accounts, not wishing to go to the trouble of maintaining a separate account. In addition, Spouse #1 withdrew funds from the joint accounts to fund other solo transactions. However, those withdrawals did not exceed the funds previously deposited based on the sale of Spouse #1's own assets.

Meanwhile, Spouse #2 maintained their own bank account into which Spouse #2 deposited their own income during the marriage. Spouse #2 had exclusive control over that account.

Assume Spouse #1 now dies. The question presented is whether Spouse #2 has a claim against the estate of Spouse #1 for half the value of Spouse #1's separate investments, even if the funds for those investments came from Spouse #1 and only passed through the joint accounts as a conduit. Because I believe Spouse #2 does not have such a claim in these circumstances, I would affirm the judgment of the district court and vacate the decision of the court of appeals.

**I. Undisputed Facts.**

Peggy Johnston was the sole witness for her case. She acknowledged that at the time of John Johnston's death, the two of them owned five parcels of real

property in joint tenancy, including their homestead and one other home. There was no debt on these properties. All of those properties went to Peggy on John's death.

In addition, the parties had a joint savings account and a joint checking account. During the years before John's death, John deposited all of his income—VA benefits, Social Security, IPERS, etc.—into the joint savings account. Peggy would then use the computer to transfer funds from the joint savings account to the joint checking account "to pay bills." Peggy testified she could view these accounts on the internet "[p]retty much" any time she wanted to.

Peggy worked outside the home during the parties' marriage. Yet none of Peggy's income, such as retirement or Social Security, went into the joint accounts; only John's income did. Peggy had her own sole account that she had opened in the 1990s. At trial, Peggy chose not to present any records concerning that account, how much had been deposited into it, or how she had used it over the years.

Regarding the $40,000 certificate of deposit (CD), John purchased it in 2015 (three years before his death), designating himself and his daughter Rebecca as joint owners. The undisputed evidence indicates that the money for this CD came from a prior CD that John had owned solely. Specifically, in 2015, John deposited $45,736.05 as the proceeds of the prior CD, left $5,736.05 in the joint savings account, and used $40,000 to buy the new CD in the joint names of himself and Rebecca. On maturity in 2017, the proceeds of the 2015 CD went into a brand new account that became owned jointly by John and Rebecca.

Regarding the $70,000 CD, John purchased it in 2016, two years before his death. Peggy acknowledged that the funds for its purchase came from the

sale of a trailer court that always had been in John's name, ever since its purchase in 1994. On maturity in 2017, the proceeds of the 2016 CD went into the same new joint account of John and Rebecca.

It is also worth noting that in 2016, John cashed in a life insurance policy for $57,000 that had been in his name and deposited the proceeds in the parties' joint savings account.

Peggy testified that John purchased the CDs and made other withdrawals without consulting her. However, she became aware of the transactions because she accessed the bank accounts on the computer to pay the couple's bills out of the joint accounts. Peggy never claimed to have objected to any of these transactions during John's lifetime.

No one disputes that the funds for both CDs passed *through* the joint savings account, very briefly in the case of the $40,000 CD. But again, it's undisputed that the funds for both CDs came from John's sole assets.

**II. The District Court Properly Granted a Directed Verdict.**

I agree with the majority that conversion is not the correct lens through which to view this case. Having said that, the record is clear that John had a pattern and practice over many years of depositing his own money—including funds from the sale of his own assets—into the joint savings account. He then used some of those funds to buy other assets in his own name, without Peggy's advance permission but without her objecting to what he was doing. Peggy used the joint accounts to pay the couple's regular bills—credit cards, utilities, cellphone, groceries, etc. Peggy, meanwhile, had a separate account whose details she did not disclose to the court.

Given these undisputed facts, the district court was correct to grant a directed verdict. Peggy failed to show that John made a withdrawal of "more than

his proportional share." *Kettler v. Sec. Nat'l Bank of Sioux City*, 805 N.W.2d 817, 823 (Iowa Ct. App. 2011). She failed to show that he withdrew "in excess of his interest." *Anderson v. Iowa Dep't of Hum. Servs.*, 368 N.W.2d 104, 110 (Iowa 1985). "[A] joint account may be found to belong, during the lifetime of all the parties, to such parties in proportion to the net contributions by each to the sums on deposit . . . ." 48A C.J.S. *Joint Tenancy* § 29, at 265 (2014) (footnote omitted). I see no basis for concluding that John breached any right of Peggy's with respect to these joint accounts. As the district court correctly observed, "all the income" came from John, and there's "great evidence that th[e] account transfers were made and done with the knowledge of the plaintiff and with her consent."

I fear that the majority's ruling will have serious adverse consequences. It will encourage lawsuits in probate proceedings by surviving spouses seeking to recover from the estate half the value of stale transactions entered into years before by the deceased spouse, even though the transactions involved the deceased spouse's own money and were done with the surviving spouse's knowledge.

Another point is worth noting. Nothing limits this principle to a spouse who is claiming the elective share. A spouse who is a will beneficiary could bring the same type of claim.

The saving grace of the majority opinion is that it seemingly allows the district court to reach the same result on remand if the evidence presented is the same, so long as the court goes through a full trial instead of granting a directed verdict. But why is the remand necessary?

The majority says there needs to be "more factfinding regarding whether John removed funds from the account in excess of either party's interest in the

account." I see no such need where Peggy failed to present evidence that John actually did remove funds beyond his interest.

For the foregoing reasons, I dissent and would affirm the district court.